# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs June 21, 2016

## STATE OF TENNESSEE v. ANTONIO TERRELL PEWITTE

**Appeal from the Criminal Court for Davidson County**
**No. 2014-A-511      J. Randall Wyatt, Jr., Judge**

_____

**No. M2015-02103-CCA-R3-CD – Filed November 14, 2016**

_____


Defendant, Antonio Terrell Pewitte, was convicted of aggravated child neglect and received a sentence of twenty years. Defendant raises the following issues in his direct appeal: (1) whether the trial court erred by failing to require the State to make an election of offenses; (2) whether the evidence is sufficient to support his conviction; (3) whether the trial court abused its discretion by admitting multiple photographs of the victim's injuries; (4) whether the trial court erred by admitting hearsay testimony; (5) whether the trial court abused its discretion by not granting a mistrial based on prosecutorial misconduct during closing argument; and (6) whether the trial court abused its discretion during sentencing. Following a careful review of the record, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined. NORMA MCGEE OGLE, J., filed a concurring opinion.

Dawn Deaner, District Public Defender; Jeffrey A. DeVasher (on appeal), Emma Rae Tennent (on appeal), Jonathan Wing (at trial), and Ellen Forrester (at trial), Assistant Public Defenders, for the appellant, Antonio Terrell Pewitte.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Brian Holmgren (at trial) and Katie Miller (at sentencing), Assistant District Attorneys General, for the appellee, State of Tennessee.


## OPINION

*Factual Summary*

For placing the hands of his girlfriend's daughter under scalding hot water, Defendant was charged with one count of aggravated child abuse resulting in serious bodily injury, *see* T.C.A. § 39-15-402(a)(1), one count of aggravated child abuse accomplished by use of a dangerous instrumentality, *see* T.C.A. § 39-15-402(a)(2), one count of aggravated child neglect resulting in serious bodily injury, *see* T.C.A. § 39-15-402(a)(1), and one count of aggravated child neglect accomplished by use of a dangerous instrumentality, *see* T.C.A. § 39-15-402(a)(2). All of these charges were indicted as alternative theories for the same criminal conduct. Defendant and his girlfriend, Mother, had been dating for almost three years at the time of the incident. She had a son, M.O., and a daughter, N.C., who was six years old.[1] Mother and her children lived with Defendant and his young son.

On the evening of December 1, 2013, Mother was at work, and Defendant was watching her children. Before dinner, N.C. went into the bathroom next to the kitchen and began washing her hands with cold water. Defendant and the other children were at the kitchen table waiting on N.C. to finish washing her hands so that they could begin eating together. Defendant joined N.C. in the bathroom and turned the faucet handle to hot water. Defendant then "grabbed" her wrists and put her hands under the hot water so that the water ran over the back of her hands and thumbs. N.C. testified that the hot water was "painful" and that she cried when she felt it. N.C. said that Defendant did not apply soap to her hands or rub her hands together while her hands were under the water. According to N.C., Defendant also "tried to put [her] face in the water."

N.C. thought that Defendant changed the water temperature because she was "taking too long," and she thought he was "angry." N.C. also testified that, prior to the incident, Defendant believed that N.C. was "messing with nail polish," so he punished her by making her "stand in the corner with one leg up and one leg down" while raising both of her hands to her head. N.C. thought that Defendant put her hands under the hot water on purpose and that it was not an accident.

Afterward, Defendant told N.C. to go sit down at the kitchen table, and she complied. During dinner, N.C.'s hands hurt and made it difficult for her to use her fork. Throughout the night, N.C. had trouble sleeping because her hands hurt.

M.O., who was twelve years old at the time of trial, testified that he was at the kitchen table and heard N.C. scream after Defendant went into the bathroom with her. M.O. saw that N.C.'s hands were red, but he did not recall Defendant doing anything to help treat N.C.'s hands. M.O. also heard N.C. "moaning" before she went to bed.

---

[1] It is the policy of this Court to protect the identities of minor victims and witnesses.

While Mother was at work, she talked with Defendant on the phone around half a dozen times. He told her that N.C. was playing with her nail polish and said that he was going to let Mother "handle it" when she got home. According to Mother, Defendant sounded "angry." On one of the phone calls, Defendant made N.C. tell Mother that she was in trouble because she "lied" about playing with the nail polish. Mother testified that she did not believe her daughter lied about the nail polish because N.C. was crying on the phone. Although they spoke on the phone numerous times, Defendant never called Mother to tell her that N.C.'s hands were burned, and he did not mention the incident to Mother when she returned home from work. Mother's shift ended at 11 p.m. When she got home, she fell asleep on the couch in the living room.

The following morning, N.C. awakened Mother and said that her hands hurt. Mother observed that there were blisters on the front and back of N.C.'s hands. The blisters covered "most" of her hands. Mother was "shocked" and "worried." Mother woke up Defendant and asked him what happened.

Given the nature of the injuries, Mother thought that N.C. needed to go to the hospital, but Defendant disagreed. Defendant told Mother that she was "stupid" and said that N.C. "didn't need to go to no f***ing hospital." Then, Defendant soaked N.C.'s hands in rubbing alcohol and tried to "pop" the blisters with a safety pin. Mother went to the store and bought gauze wrap and Neosporin cream. She used both to treat N.C.'s hands.

Mother called her mother, Carla Agins, and told her about what happened. After learning that N.C.'s hands were burned, Ms. Agins called 911 and the hotline for the Department of Children's Services. According to Ms. Agins, Mother seemed scared because she was whispering on the phone.

Detective Jeffrey Gibson of the Nashville Police Department went to the house and inspected the bathroom where the incident occurred. When Detective Gibson arrived, Defendant was cooperative and seemed "visibly upset." The sink's faucet had a single lever which turned back and forth horizontally to change the water temperature. Detective Gibson turned on the hot water as high as it would go and then he used a digital thermometer to check the temperature of the water over a period of about two minutes. The temperature of the water fluctuated, but the highest reading was 141.6 degrees Fahrenheit, and the most consistent temperature reading was around 131.6 degrees Fahrenheit. When Detective Gibson checked the water temperature with an analog thermometer, it reached almost 130 degrees Fahrenheit. While the water was running, steam would come from the water intermittently.

After checking the hot water heater, Detective Gibson discovered that the temperature control dial was on the setting just below the hottest. The hot water heater was located next to the bathroom, so the water would not have had to travel far before reaching the bathroom faucet. Mother testified that she had not adjusted the hot water heater temperature settings. She was not aware that anyone had previously been burned by the hot water in their home. The house in which they lived was government-owned housing, so the tenants did not handle maintenance issues.

An ambulance took N.C. to the hospital, where she remained for six days, during which she received aqua therapy and had to perform exercises "to keep flexibility in her hands." N.C. stayed on pain medication throughout the hospitalization. Mother had to change N.C.'s bandages twice a day after N.C. was discharged, and N.C. had to continue doing flexibility exercises for two months.

Carrie Donnell was a nurse practitioner at Vanderbilt University Medical Center who evaluated N.C. in the emergency department on the day after the incident. The trial court certified her as an expert in child abuse pediatrics without objection. Ms. Donnell described N.C.'s injuries as a mix of superficial thickness burns and partial thickness burns located on "the palm and the back of her hand and then extended from her wrist down to her fingers" on each hand. Ms. Donnell explained:

> [B]urns are described . . . on a continuum being partial thickness to full thickness burns. And within partial thickness, you can have superficial and deep partial thickness burns. So, if you think about a superficial burn, it would be like a sunburn, redness to the skin, but no loss of skin. And then, as the burn progresses and gets . . . deeper, you will have blistering and loss of skin. In a full thickness burn, [it] would enter into subcutaneous tissue and even bone.

The majority of N.C.'s burns were partial thickness burns, including deep partial thickness burns on both hands. Ms. Donnell explained that "superficial and partial thickness burns are actually more painful than full thickness burns . . . because the nerve endings are exposed but not yet killed off, . . . and the full thickness burns are so deep that the nerve endings are just completely [gone], . . . so you don't actually feel that sensation anymore." Because N.C.'s burns were of the former type, they required "ongoing pain management" until they healed.

After N.C. sustained the injuries, "her hands would have been obviously very red. While they might not have been blistered immediately upon burn—that would have developed over some time—but it would have been clear to any prudent caregiver that she had been injured." Ms. Donnell explained that immediate medical attention is "very important" for a child with such injuries in order to reduce the risk of developing

"difficulty in flexing that extremity or body part." Ms. Donnell testified that popping the blisters and applying burn ointment was not "an appropriate form of medical intervention" for N.C.'s injuries because opening a wound increases the risk of infection. N.C.'s injuries caused loss of pigmentation to her skin and also reduced the range of motion in her hands.

Ms. Donnell testified that the burns on N.C.'s hands were consistent with both hands having been placed "perpendicular to the floor" with the thumbs upwards underneath the hot water. According to Ms. Donnell, a child can comfortably wash in hot water with a temperature of about 101 degrees, and burns can begin forming at 113 degrees with prolonged exposure. A child like N.C. would be expected to cry out in pain and withdraw from 113-degree water. Accordingly, N.C.'s injuries were not accidentally self-inflicted. N.C.'s burns required "increased temperature and increased exposure time" beyond that of quick contact with 113-degree water. Ms. Donnell testified that, in water of 130 degrees Fahrenheit, it would take approximately six to ten seconds for a child to sustain the injuries that N.C. did. A full thickness burn would result after approximately one second from a child's exposure to water of 140 degrees Fahrenheit.

Defendant did not testify. The jury convicted Defendant of one count of aggravated child neglect, a Class A felony, and acquitted him of the other three counts. The trial court sentenced Defendant to serve twenty years and denied his motion for new trial. Defendant timely filed a notice of appeal.

*Analysis*

Defendant raises the following issues: (1) whether the trial court erred by failing to require the State to make an election of offenses; (2) whether the evidence is sufficient to support his conviction; (3) whether the trial court abused its discretion by admitting multiple photographs of the victim's injuries; (4) whether the trial court erred by admitting hearsay testimony; (5) whether the trial court abused its discretion by not granting a mistrial based on prosecutorial misconduct during closing argument; and (6) whether the trial court abused its discretion during sentencing.

A. Election of Offenses

Defendant argues that his right to a unanimous jury verdict was violated when the trial court refused to require the State to elect which offense it was prosecuting under each count of the indictment. He maintains that the jury's guilty verdict for aggravated child neglect could have been based on either his conduct in holding the victim's hands under hot water or his conduct in failing to seek prompt medical assistance for the victim. The State argues that no election was required because Defendant's continuing course of conduct was a single offense. We agree with the State.

A criminal defendant's constitutional right to a jury trial includes the right to a unanimous jury verdict. *See State v. Lemacks*, 996 S.W.2d 166, 169-70 (Tenn. 1999). "[W]here the prosecution presents evidence to the jury that tends to show more than one criminal offense, but the underlying indictment is not specific as to the offense for which the accused is being tried," the trial court must require the State to elect which offense it is submitting for the jury's consideration. *Id.* at 170. The purpose of the election requirement is to prevent "patchwork" verdicts, wherein some of the jury base their decision on one offense, while others base their decision on another offense. *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993). Accordingly, no election is necessary where there is only evidence of a single offense. *State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000).

In *Adams*, our supreme court declared that child neglect may be a single, "continuing course of knowing conduct beginning with the first act or omission that causes adverse effects to a child's health or welfare" and continuing "until the person responsible for the neglect takes reasonable steps to remedy the adverse effects to the child's health and welfare caused by the neglect." *Id.* at 296. Although not always the case, "a continuing offense may be composed of multiple discrete acts where a single scheme or motivation is present." *Id.*

In this case, the conduct for which Defendant was prosecuted and convicted was a continuing course of conduct which began when he caused the victim's hands to be burned by holding them under hot water and continued for as long as he failed to properly attend to her injuries.[2] This remains true even though the course of conduct was composed of more than one discrete act. While failure to seek medical care, in some cases, may constitute the entirety of the allegedly criminal conduct for a charge of neglect, we do not believe that it necessarily follows that an election of offenses is required anytime a period of failure to seek medical care accompanies other discrete conduct which more directly contributes to the infliction of injury. Under these circumstances, there was no need for an election of offenses because the neglect charges were predicated upon a single, continuing course of conduct, and therefore, the evidence only suggested a single criminal offense of neglect. Defendant is not entitled to relief on this basis.

B. Sufficiency of the Evidence

---

[2] Indeed, the jury instructions informed the jury as much: "'Neglect' is a continuing course of conduct beginning with the first act or omission that causes adverse effects to a child's health and welfare and can be an act of commission or omission. Neglect also includes a failure to provide or seek appropriate medical care."

Closely related to the preceding argument, Defendant argues that the evidence is insufficient to support his conviction for aggravated child neglect because "[n]o evidence established that the defendant's failure to seek immediate medical treatment, or any other act of neglect, caused serious bodily injury to the victim." The State disagrees.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Reid*, 91 S.W.3d at 277. Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). This standard of review applies whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Tennessee Code Annotated section 39-15-401(b) makes it a crime to "knowingly . . . neglect[] a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare[.]" When the neglect "results in serious bodily injury to the child," it becomes aggravated child neglect. T.C.A. § 39-15-402(a). Serious bodily injury includes "extreme physical pain," "protracted or obvious disfigurement," "protracted loss or substantial impairment of a function of a bodily member," and "second- or third-degree burns." T.C.A. § 39-11-106(34); T.C.A § 39-15-402(d). To establish the offense, "the defendant's neglect [must have] produced an actual, deleterious effect or harm upon the child's health and welfare," rather than merely "a risk of harm." *State v. Mateyko*, 53 S.W.3d 666, 671-72 (Tenn. 2001).

The evidence in this case establishes that Defendant joined the victim in the bathroom as she was washing her hands for dinner. He turned the water faucet from cold

to hot, grabbed both of the victim's wrists, and held her hands under the hot water. The victim yelled and began crying because the water was painfully hot. Later, she had difficulty using her fork at dinner and had trouble sleeping because of the burns on her hands. The victim's brother noticed that her hands were red and heard her moaning before she went to sleep. The following morning, the victim's hands continued to hurt and were covered in severe blisters. Although the victim's mother wanted to take the victim to a doctor, Defendant refused and instead chose to treat the victim's injuries by popping the blisters with a safety pin. The victim's mother then applied ointment and wrapped the injuries with bandages.

Ultimately, the victim sustained both superficial thickness and partial thickness burns on both of her hands. The medical expert testified that these types of burns were more painful than other types of more severe burns and required continuous pain management. The medical expert also testified that Defendant's methods of treating the injuries were inappropriate because they increased the risk of infection. The victim's injuries precipitated a six-day hospital stay and required months of physical therapy. Even after treatment, the victim's hands remained discolored and suffered a reduced range of motion.

The hot water heater in Defendant's home was set on the next to hottest temperature setting and was producing water up to around 130 degrees Fahrenheit with possible spikes in temperature over 140 degrees Fahrenheit. Even after the incident occurred, Defendant did not take any action to mitigate the victim's suffering, such as running her hands under cool water or giving her pain reducer. Although Defendant was on the phone with the victim's mother throughout the day, he never informed her about the incident.

Defendant does not contest that the victim suffered serious bodily injury or that the evidence is sufficient to establish knowing neglect of the victim. Instead, he maintains that the victim's burns were caused by his conduct in holding the victim's hands under hot water, for which the jury acquitted him of child abuse, and were not caused by his conduct in failing to seek prompt medical attention for the victim, for which he was convicted of child neglect. Accordingly, Defendant argues that the evidence is insufficient to support his conviction for aggravated child neglect because his neglectful conduct did not cause the victim's serious bodily injury. We disagree.

As explained above, Defendant's conviction for aggravated child neglect is predicated on a single, continuing course of conduct which includes the burning of the victim's hands and the ensuing failure to seek medical treatment. It was that entire course of conduct which caused not only the victim's burns but also her accompanying extreme physical pain, which persisted until she received proper medical attention. Defendant draws several conclusions from the jury's acquittal on the other three counts to

support his argument that the neglectful conduct was limited to his failure to seek medical attention for the victim. However, in accordance with our case law regarding inconsistent verdicts, we decline to make any extrapolations from the acquittals. *See, e.g.*, *State v. Davis*, 466 S.W.3d 49, 76-77 (Tenn. 2015).

Defendant relies on a line of cases holding that, when a defendant is convicted of both child abuse and child neglect, there must "exist some evidence that the alleged act of neglect resulted in serious bodily injury in addition to and apart from the serious bodily injury caused by the initial act or abuse." *State v. Wanda Elaine Brock*, No. E2009-00785-CCA-R3-CD, 2011 WL 900053, at *5 (Tenn. Crim. App. Mar. 16, 2011), *no perm. app. filed*.[3] However, those cases are distinguishable. This was not a case where the neglect charge was confined to ongoing failure to seek medical treatment. Neither was this a case where the State was seeking two separate convictions for separate acts of abuse and neglect, such that each offense required a separate injury.[4] Here, both parties and the trial court understood, acknowledged, and agreed that the State was ultimately seeking only one conviction and that all counts were alternative theories of guilt for the same continuing course of conduct because the State was uncertain about how the jury would interpret the proof. Thus, we conclude that the evidence was sufficient for a rational jury to find that this entire course of conduct, which began with Defendant neglectfully holding the victim's hands under hot water and continued through Defendant's failure to seek medical treatment, caused the victim's injuries.

## C. Photographs of Injuries

---

[3] Defendant also cites *State v. James Prindle*, No. W2012-02285-CCA-R3-CD, 2014 WL 683879, at *22-23 (Tenn. Crim. App. Feb. 19, 2014), *perm. app. denied* (Tenn. Sept. 18, 2014); *State v. Jeffrey Scott Gold*, No. E2012-00387-CCA-R3-CD, 2013 WL 4278760, at *13-14 (Tenn. Crim. App. Aug. 15, 2013), *perm. app. denied* (Tenn. Jan. 14, 2014); *State v. Marcos Acosta Raymundo*, No. M2009-00726-CCA-R3-CD, 2010 WL 4540207, at *13-15 (Tenn. Crim. App. Nov. 10, 2010); *State v. John Barlow*, No. W2008-01128-CCA-R3-CD, 2010 WL 1687772, at *11 (Tenn. Crim. App. Apr. 26, 2010), *perm. app. denied* (Tenn. Sept. 24, 2010); *State v. Denise Wiggins*, No. W2006-01516-CCA-R3-CD, 2007 WL 3254716, at *4-5 (Tenn. Crim. App. Nov. 2, 2007), *perm. app. denied* (Tenn. Mar. 3, 2008); and *State v. Vernita Freeman*, No. W2005-02904-CCA-R3-CD, 2007 WL 426710, at *1 (Tenn. Crim. App. Feb. 6, 2007).

[4] Some of the cases cited by Defendant were decided before our supreme court's observation in *Dorantes*, 331 S.W.3d at 385 n.15, that child abuse and child neglect are now separate offenses rather than a single offense committed by alternative courses of conduct, as was previously the case, *see Mateyko*, 53 S.W.3d at 668 n.1. As such, it remains to be determined whether convictions for both child abuse and child neglect can stand for the same course of conduct. *Cf. State v. Vernica Shabree Calloway*, No. M2011-00211-CCA-R3-CD, 2014 WL 1394653, at *29 n.6 (Tenn. Crim. App. Apr. 4, 2014) (taking no position on whether dual convictions may stand without merger where a charge of child abuse is predicated upon one act in a continuous course of conduct which is also the basis for a charge of child neglect), *perm. app. denied* (Tenn. Sept. 25, 2014). We need not take a position on it here because Defendant was only convicted of one offense.

Defendant argues that the trial court erred by admitting numerous photographs of the victim's injuries at various stages of treatment and healing because many of the photographs were unnecessarily cumulative and unfairly prejudicial. The State disagrees.

To be admissible, evidence must satisfy the threshold determination of relevancy mandated by Rule 401 of the Tennessee Rules of Evidence. *See, e.g.*, *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by . . . the danger of unfair prejudice." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403, Advisory Comm. Cmts).

Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issue at trial and their probative value is not substantially outweighed by their prejudicial effect. *Banks*, 564 S.W.2d at 949-51. On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." *Id.* at 951 (citing *Milam v. Commonwealth*, 275 S.W.2d 921 (Ky. 1955)). The decision as to whether such photographs should be admitted is entrusted to the trial court, and that decision will not be reversed on appeal absent a showing of an abuse of discretion. *Id.* at 949; *State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993).

In *Banks*, the Supreme Court gave the trial courts guidance for determining the admissibility of relevant photographic evidence and determined that a trial court should consider the following: (1) the accuracy and clarity of the picture and its value as evidence; (2) whether the picture depicts the body as it was found; (3) the adequacy of testimonial evidence in relating the facts to the jury; and (4) the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions. *Id.* at 951. "Moreover, the admissibility of photographic evidence does not depend upon the defendant's offer to stipulate to the facts depicted therein." *State v. Carruthers*, 35 S.W.3d 516, 577 (Tenn. 2000).

In this case, the trial court denied a pre-trial motion to suppress photographs of the victim's injuries, and at trial, it admitted thirteen photographs. Seven of those photographs were taken on the day of the victim's admittance to the hospital; four photographs were taken on the following day; and the remaining two were taken at different times later in the healing process. Of the first seven, there is one photograph of

each side of each of the victim's hands, showing the blisters. The remaining three in that group are similar to the previous photographs but include a ruler next to the victim's hands. Of the four photographs taken on the second day of her hospital stay, there is one photograph for each side of each hand, showing partially removed blisters. The next photograph shows the palm side of the victim's right hand with debrided blisters. The last photograph shows the backside of both of the victim's hands and the loss of pigmentation resulting from the burns.

Defendant argues that the three additional photographs of the initial seven were cumulative. Defendant also argues that the photographs taken later in the healing process were not relevant to the nature of the injuries. We disagree. While the photographs were accompanied by testimony from the medical expert, we believe the photographs were still probative and helpful to the jury. The State was required to prove serious bodily injury, and the photographs were relevant to prove the nature of the victim's injuries. Evidence of disfigurement and impairment of function as depicted in the latter photographs is relevant to serious bodily injury as defined by statute. We note that all of the pictures are unpleasant, but none are particularly repulsive or gruesome. The number of photographs is not excessive. Having reviewed the photographs, we cannot say the trial court abused its discretion by admitting any of the photographs.

D. Hearsay

Defendant argues that the trial court erred by admitting into evidence statements made by the victim to the nurse practitioner at the hospital. Defendant maintains that the statements were procured for the purpose of facilitating criminal prosecution rather than for medical diagnosis and treatment. The State disagrees.

Tennessee Rule of Evidence 803(4) allows for the admission of hearsay in the form of statements for the purposes of medical diagnosis or treatment. The rule requires either that (1) the statement must have been made for the purposes of diagnosis and treatment, in effect describing medical history, past or present symptoms, or pain or sensations, or (2) the statement must address the cause or source of the problem if reasonably pertinent to diagnosis and treatment. *State v. McLeod*, 937 S.W.2d 867, 870 (Tenn. 1996). This hearsay exception is justified because "the declarant's motive of obtaining improved health increases the statement's reliability and trustworthiness." *State v. Barone*, 852 S.W.2d 216, 220 (Tenn. 1993). In addition, "if physicians or other medical personnel rely upon the statement in diagnosing and treating the patient, then the statement should be sufficiently trustworthy to be admissible in a court of law." *McLeod*, 937 S.W.2d at 870 (citing *Barone*, 852 S.W.2d at 220; *State v. Edwards*, 868 S.W.2d 682, 699 (Tenn. Crim. App. 1993)).

In order to determine the admissibility of a statement made by a child-declarant pursuant to Rule 803(4), the trial court is required to conduct an evidentiary hearing outside the jury's presence. *Id.* at 869. When determining whether a child's statement qualifies for a hearsay exception under Rule 803(4), the trial court "must consider criteria such as the circumstances surrounding the making of the statement," including "the timing of the statement and its contents," whether "the statement was inappropriately influenced by another," whether the statement "was in response to suggestive or leading questions," and whether there were any other factors that might "affect trustworthiness, such as a bitter custody battle or family feud." *Id.* at 871.

Ms. Donnell was employed by Vanderbilt University Hospital and worked in their Child Abuse Response and Evaluation ("CARE") Team. The CARE Team is called in to evaluate injuries possibly caused by child abuse or neglect. Ms. Donnell and her team act as a liaison with the Department of Children Services and law enforcement officers when necessary. The CARE Team works on over 200 cases each year, and Ms. Donnell handles about a third of those cases. In every case, Ms. Donnell takes a medical history from the child, if able to speak, as well as the caregiver. The medical history includes questions about the source of and the circumstances surrounding an injury because that information is useful in formulating a medical diagnosis and recommendations for treatment. Medical professionals also use this information to ensure that a child will not be released back into an environment where the injury may occur again. Knowledge of previous injuries or a history of domestic violence against a patient would be utilized by any medical professional in diagnosing and treating an injury. In her capacity, Ms. Donnell does not actually provide treatment to patients, but she makes treatment recommendations to the attending physician. Ms. Donnell testified, "The purpose of my evaluation is strictly medical. It has an investigative value, but we are not investigators . . . ."

At trial, the prosecutor asked Ms. Donnell to read the medical history portion of her medical record for N.C. Ms. Donnell conveyed the following:

I first met with [N.C.] at the bedside who reports that last night she was washing her hands in the bathroom before dinner and that her mother's boyfriend, who she refers to as daddy, purportedly told her to "hurry up and wash her hands." When I asked how she hurt her hands, she states, "My daddy put them under hot water." When asked why she thinks he did that, she states, "I was going slow, washing, and then he came in and put it on hot water." She reports that he was "mad" when he did this "because he is tired of me because I didn't hurry up and wash my hands." When asked what . . . the temperature was when she first went in the bathroom to wash her hands, she states, "I put it on cold water first." She states that, after he turned the water to hot, "He put my hands under hot water." She reports

-12-

that she pulled her hands out of the water. She reports that she did not say anything at the time but states, "My hands were red. It hurt." When asked if her father said anything to her after that, she states, "He told me to sit down."

Later, Ms. Donnell testified that N.C. told her that she had been placed in a corner as a form of discipline. She also related what she learned about the incident from Mother. Mother told her that N.C.'s hands looked like "water balloons" and that N.C. appeared to be in pain. Mother also explained what she and Defendant did to treat the burns and told Ms. Donnell that she called her mother about the incident.

Defendant relies on *State v. Cannon*, 254 S.W.3d 287, 304-05 (Tenn. 2008), where our supreme court held that statements made by a patient to a sexual assault nurse examiner violated the Confrontation Clause. However, that case is factually distinguishable from this case, and the court only conducted a Confrontation Clause analysis—it did not discuss whether the victim's statements satisfied the hearsay exception under Rule 803(4).

Our courts have routinely applied this hearsay exception to statements of victims provided in response to questions about how an injury was inflicted. *See, e.g.*, *State v. Parker*, 350 S.W.3d 883, 901 (Tenn. 2011). Additionally, our supreme court has determined that "statements made to a physician identifying a perpetrator who is a member of a child's household may be reasonably pertinent to proper diagnosis and treatment of emotional and psychological injury." *State v. Stinnett*, 958 S.W.2d 329, 333 (Tenn. 1997) (quoting *State v. Livingston*, 907 S.W.2d 392, 397 (Tenn. 1995)). Here, Ms. Donnell testified that she was conducting a medical evaluation not an investigation. Her questions about the nature of the injury and the circumstances under which it was caused were intended to elicit information that any physician would utilize in diagnosing and treating injuries to a child. Similarly, the statements made by the victim's mother describing the victim's injuries and the steps taken to provide treatment prior to hospitalization were relevant to diagnosis and treatment. The trial court did not err by admitting testimony about the statements made regarding the victim's injuries. Defendant is not entitled to relief on this issue.

### E. Prosecutorial Misconduct

Defendant argues that the trial court erred by failing to grant a mistrial based on inappropriate closing argument by the prosecutor. The State responds that no prosecutorial misconduct occurred.

A trial court has the authority to declare a mistrial, and its decision is reviewed for an abuse of discretion. *See State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009).

-13-

"Normally, a mistrial should be declared only if there is a manifest necessity for such action." *State v. Saylor*, 117 S.W.3d 239 (Tenn. 2003). A mistrial is appropriate when "a trial cannot continue, or a miscarriage of justice would result if it did." *Id.* (internal quotation omitted).

Closing argument is "a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001); *see State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001); *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). Closing arguments "have special importance in the adversarial process," allowing the parties "to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008). Attorneys "should be given great latitude in both the style and the substance of their arguments." *Id.* at 131. "[A] prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." *Id.* Although not exhaustive, this Court has recognized five general areas of prosecutorial misconduct during closing arguments: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or evidence or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused; (5) arguing or referring to facts outside the record unless the facts are matters of common public knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

A trial court has significant discretion in controlling closing argument, and its decisions relative to the contents of argument may only be reversed upon an abuse of discretion. *Terry*, 46 S.W.3d at 156; *State v. Trusty*, 326 S.W.3d 582, 607 (Tenn. Crim. App. 2010). "A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Banks*, 271 S.W.3d at 131. Instead, "an improper closing argument will not constitute reversible error unless it is so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice." *Id.* In reviewing the propriety of a prosecutor's closing argument, this Court considers:

> (1) the conduct at issue in light of the facts and circumstances of the case,
> (2) the curative measures undertaken by the trial court and the prosecution,
> (3) the intent of the prosecutor in making the improper argument, (4) the cumulative effect of the improper argument and any other errors in the record, and (5) the relative strengths and weaknesses of the case.

*Id.*; *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

Defendant first complains about allusions to a fictitious radio show character called "The Shadow." The prosecutor quoted a line from the show, "Who knows what

evil lurks in the hearts of men? The Shadow knows." The prosecutor then went on to make several comments and ask rhetorical questions about the difficulty of discerning one's intent or motives for one's conduct. When concluding, the prosecutor said, "Ladies and gentlemen, who knows what evil lurks in the hearts of men? You have seen a little glimpse of that evil in the courtroom."

Having carefully reviewed the transcript of the State's closing argument, it appears that the purpose of these comments may have been to highlight that the jury had the difficult responsibility of determining the nature of Defendant's conduct and his accompanying state of mind. However, we believe that the prosecutor's statements using the word "evil" were improper because, in this context, they subtly suggested that the defendant either had an evil heart or embodied the evil "glimpse[d]" in the courtroom by the jury.

Defendant next complains about the prosecutor's references to child abuse cases in general. The prosecutor argued that cases involving burns always occur in "a two-step process" involving a preparatory step and then an execution step. The prosecutor then suggested that the preparatory step in such cases is evidence of the accused's guilty state of mind. While making this argument, the prosecutor referred to other instrumentalities that are commonly involved in burn cases, such as hot water, a lighter, a cigarette, and an iron. Defendant maintains that the prosecutor was arguing evidence outside of the record by making these references. However, we do not think that is an accurate characterization of that argument. The prosecutor never asserted or suggested that any of those other hypotheticals occurred in this case. Instead, he was merely using examples of other types of conduct to help the jury understand the State's theory of the case—that Defendant intended to harm the victim and "staged" his crime by turning the water faucet from cold to hot. While we take no position on the efficacy of such an argument, we cannot say that the prosecutor's comments amounted to inappropriately arguing evidence outside of the record.

Last, Defendant complains about a statement made by the prosecutor in his rebuttal closing argument: "[Defense counsel] suggests that we are essentially arguing that a parent who carries a baby out and slips and falls on the ice is guilty of child abuse or neglect. How many of those cases do you think I have prosecuted?" Defendant maintains that the prosecutor was invoking the reputation of his office and his personal judgment to implicitly vouch for the integrity of the prosecution in this case. We agree. In this instance, the prosecutor's remark implied that he would not have prosecuted this particular case against Defendant unless he personally believed Defendant was guilty. Expressions of personal belief about the case which "exploit the influence of the prosecutor's office" are prohibited. *Goltz*, 111 S.W.3d at 6. This comment was improper.

Nonetheless, under the totality of the circumstances, we conclude that the improper comments made during closing argument did not constitute such error that warranted a mistrial. The improper comments during closing argument were neither particularly egregious nor pervasive. We do not believe that the comments were "so improper ... or inflammatory that it affected the verdict to the [defendant's] detriment." *See Goltz,* 111 S.W.3d at 5. Furthermore, any benefit that would have presumably inured to the State from the improper comments appears to have not materialized because the jury did not find Defendant guilty of child abuse on the State's theory of intentional mistreatment of the victim. Based on the record as a whole, we conclude that the trial court did not abuse its discretion by failing to grant a mistrial based on the prosecutor's improper comments during closing argument. Defendant is not entitled to relief on this basis.

## F. Sentencing

Defendant argues that the trial court abused its discretion by imposing an excessively lengthy sentence. When a defendant challenges the length or manner of service of a within-range sentence, this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of the Sentencing Act." *Bise*, 380 S.W.3d at 707. A trial court abuses its discretion in sentencing when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997) (citing *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996)). This deferential standard does not permit an appellate court to substitute its judgment for that of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The defendant bears the burden of proving that the sentence is improper. T.C.A. § 40-35-101, Sentencing Comm'n Cmts.

In reaching its decision, the trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. § 40-35-102, -103, -210(b); *see also Bise*, 380 S.W.3d at 697-98. Additionally, the sentence imposed "should be no greater than that deserved for the offense committed" and also "should be

the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4).

This Court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. The weighing of various enhancement and mitigating factors is within the sound discretion of the trial court. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The misapplication of an enhancement or mitigating factor by the trial court "does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706.

Aggravated child neglect is a Class A felony. T.C.A. § 39-15-402(b). The pertinent sentencing range for a standard offender is fifteen to twenty-five years. T.C.A. § 40-35-112(a)(1). After conducting a sentencing hearing, the trial court imposed a within-range sentence of twenty years.

At the sentencing hearing, the trial court considered the presentence report, which indicated that Defendant had four previous felony convictions. Detective Gibson testified about a statement made by Defendant during the investigation, in which he admitted "that he knew he that he had burned her because he knew how hot the water can get, and at that time, he advised . . . that he had burned himself on that water resulting in a blister to his own hand." Defendant also stated that he observed that the victim's hands were "a little red." An audio recording of the statement was introduced into evidence. Additionally, the victim's grandmother, Ms. Agins, testified about the scarring on the victim's hands.

Defendant's mother, Nellie Guyton, testified that Defendant "had compassion for people" and "got along well with people." She stated that Defendant's father did not help raise Defendant. Defendant's younger brother, Alvin Bond, testified that Defendant was an "outgoing" and "hard-working person." Ken Novak, a prison minister, testified that Defendant "attended every single [church] service" since February 2014. Mr. Novak described Defendant as a "very sincere man [with a] strong desire to live right." Mr. Novak stated that Defendant has expressed remorse about the incident in this case.

Defendant testified that he felt a special connection with N.C. and considered her to be his own daughter. He explained that "it hurts to know that I hurt[] her, and it also hurts to know that I can't ever be around no more." Defendant told his version of the incident and described it as an accident that occurred while he was distracted by the other children. Defendant denied that he was punishing N.C. with the hot water or intentionally trying to harm her. He said that he noticed her hands were red, and after it happened, he rinsed her hands with cold water and then "patted butter on her hands." Defendant denied knowing that the injury was serious before N.C. went to bed.

Defendant explained that he incurred the felony convictions when he was young and testified that he attended various classes while in confinement, including an anger management class. During cross-examination, Defendant acknowledged that he previously pled guilty to assaulting N.C.'s mother.

The trial court took the case under advisement and issued a written sentencing order. In determining the length of Defendant's sentence, it applied four enhancement factors: Defendant had a previous history of criminal behavior; the victim was treated with exceptional cruelty; the victim's injuries were particularly great; and Defendant abused of a position of private trust. *See* T.C.A. § 40-35-114(1), (5), (6), (14). The trial court applied one mitigating factor: Defendant completed corrective programs and did not have a disciplinary record while incarcerated. *See* T.C.A. § 40-35-113(13).

Defendant argues that the trial court erroneously applied the enhancement factors for exceptional cruelty and particularly great injuries and that it failed to apply the mitigating factor for crimes not motivated by a sustained intent to violate the law. *See* T.C.A. § 40-35-113(11). However, even if these assertions were true, that would not remove the presumption of reasonableness afforded to the trial court's sentencing decision. *See Bise*, 380 S.W.3d at 706. Defendant does not contest that the trial court properly applied the enhancement factors for previous criminal history and abuse of a position of private trust, and the application of those enhancement factors is supported by the record. Because the trial court properly applied at least two enhancement factors and imposed a within-range sentence that is consistent with the purposes and principles of the sentencing scheme, the trial court did not abuse its discretion in deciding Defendant's sentence. Defendant is not entitled to relief on this issue.

*Conclusion*

Based on the foregoing, the judgment of the trial court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE

-18-